In the Matter of **RIVERBEND LEASING LLC, Debtor.**

No. 10-00428-als11.

United States Bankruptcy Court, S.D. Iowa.

May 13, 2011.

---

Donald F. Neiman, Jeffrey D. Goetz, Des Moines, IA, for Debtor.

## MEMORANDUM OF DECISION

ANITA L. SHODEEN, Bankruptcy Judge.

Debtor's Second Amended Plan and a Motion for Relief from Stay filed by the primary secured creditor are before the Court. Jurisdiction of these matters are governed by 28 U.S.C. sections 157(b)(1) and 1334. For the reasons discussed herein, confirmation of the Debtor's Second Amended Plan is denied.

Riverbend Leasing L.L.C. is a limited liability company formed under Iowa law in April 2002. ("Debtor" or "Riverbend"). The original members of the entity included John Pratt, Alan Meyer and Daniel Ahrens ("Guarantors"). In this same year it began construction on its single asset, a condominium regime which was to include multifamily dwellings and single family residences located in Ottumwa, Iowa. In 2003, tenants began occupying the premises. In January 2005 Ahrens transferred his membership interest to the two remaining individuals. This resulted in ownership percentages as follows: Pratt 62.5% and Meyer 37.5% ("Insiders"). At the time of hearing, 112 condominium units had been completed and five vacant lots had not yet been developed[1] ("Project").

A mix of properties surround the Project, including a diabetes clinic operated by the University of Iowa, a convenience store, a nursing home and multiple single family homes.

On May 16, 2001, Security Bank of Kansas City ("Bank") and the Debtor entered into a series of transactions, which included a promissory note in the amount of $9,950,000 with a fixed interest rate of 6.5% for 24 months followed by a variable rate, Construction Loan Agreement, Construction Mortgage, Commercial Security Agreement and Assignment of Rents. All collateral is subject to properly perfected security interests in favor of the Bank. Unlimited personal guarantees ("Guarantees") were executed in favor of the Bank by each of the three original members of Riverbend.

Due to the Debtor's default under the loan agreements the Bank filed a foreclosure action in the Iowa District Court on March 6, 2009. Named Defendants in this litigation included the Debtor and the Guarantors. The parties entered into a stipulated order appointing Dial Properties Company ("Dial") as receiver.[2] On November 16, 2009 the state court granted partial Summary Judgment on the issue of default, but determined that there were genuine issues of material fact as to the amount owing and attorney fees.

The Debtor filed bankruptcy on February 8, 2010. An adversary proceeding was commenced on the same date seeking injunctive relief, in the form of a restraining order, to preclude the Bank from continued collection efforts against the Guarantors in the pending state court litigation. A few days later a second adversary pro-

---

1. The completed units were less than the number projected under the original development plan which proposed 15 buildings with a total of 180 units.

2. Pursuant to a Property Management Agreement dated December 2007 Dial had been engaged as an outside, third party, property manager related to the Project.

ceeding was filed by the Debtor against the Bank and Dial to compel turnover of estate property from the receivership. Although the parties vigorously defended their respective positions, all of these matters were resolved prior to evidentiary hearings, and the adversary proceedings were eventually dismissed.

Use of cash collateral is in place by virtue of the parties' stipulations. The most recent order provided that the Bank would retain its liens post-petition and receive monthly adequate protection payments in the amount of $32,822.72. The Debtor has been fulfilling this obligation. Upon the approval of the Amended Disclosure Statement the confirmation hearing on the First Amended Plan was scheduled. Thereafter, the Bank filed a Motion for Relief from Stay alleging that its treatment under the plan is impermissible, that the Debtor lacks equity in the property and that Riverbend cannot effectively reorganize. Hearing on this Motion was scheduled in conjunction with the hearing on plan confirmation. Several continuances were sought, and granted, related to these matters.

On December 13, 2010 a Second Amended Plan ("Plan") was filed by Riverbend. As with its previous plans, the Debtor proposes to pay creditors in full. The Plan provides that the Bank's claim is to be treated as fully secured in the amount allowed by the Court. Payment is proposed over a period of fifteen years at a fixed interest rate of 4.25%, amortized over thirty years. Interest only payments are to be paid during the first eighteen months after the effective date of the Plan. Any claim allowed pursuant to 11 U.S.C. section 506, at the Debtor's discretion, may be capitalized, added to the outstanding loan balance or paid separately over a period of five years at 5% interest. The Plan also enjoins the Bank from pursuing enforcement against the Insiders under their Guarantees as long as there is no default under the terms of the confirmed Plan.

The Plan Ballot Summary filed with the Court for the First Amended Plan requests cram down based upon the voting results. The Bank is the only creditor rejecting the Plan and objecting to confirmation. On December 16, 2010 hearings on confirmation of the Debtor's Second Amended Plan ("Plan"), all objections thereto filed by the Bank, and the contested Motion for Relief from Stay were conducted. At the close of evidence, and after the parties' arguments, the Court deferred final determination of issues involving confirmation and relief from stay pending resolution of the contested Objection to the Bank's proof of claim, and a Motion for Administrative Expenses filed by Dial Properties. These matters have now been resolved.

## DISCUSSION

### PLAN CONFIRMATION

To obtain confirmation the Debtor must satisfy the sixteen factors set forth at 11 U.S.C. section 1129(a) (2011). In this case a second component to obtain confirmation arises under 11 U.S.C. section 1129(b) which permits confirmation over the objection of a creditor if its plan treatment is deemed "fair and equitable." Each of the Bank's objections to confirmation will be considered separately.[3]

*11 U.S.C. section 1129(a)(1)*

Pursuant to this provision, the Court may only confirm a plan if it "com-

---

**3.** The confirmation standards under 1129(a) that are not subject to dispute will not be addressed.

plies with the applicable provisions of this title". The primary dispute arising under this confirmation standard is the Debtor's position that the Bank should be precluded in any attempts to enforce the Insiders' Guarantees. The relevant portions of the Plan related to this issue are as follows:[4]

Security Bank shall be enjoined from pursuing the Insiders or members of the Debtor under personal guarantees of amounts owed to Security Bank *as long as and only if* the Reorganized Debtor is current and not in default under the provisions of this Plan and the modified terms of the Promissory Note and Loan Documents described herein. (emphasis original).

and

Upon the Confirmation Order becoming a Final Order, the Debtor's pre-petition default under the initial Promissory Note and Loan Documents, and upon which summary judgment was entered against the Debtor . . . on November 18, 2009 . . . shall be deemed cured, and the basis for said Summary Judgment shall be voided and *such obligations discharged.* To the extent necessary the [Debtor] shall file a copy of this [Plan] and Confirmation Order, with the Iowa District Court . . . so as to advise . . . that said state court action is and should be promptly dismissed as *against all named defendants therein.* (emphasis added).

In support of these Plan provisions, Riverbend relies upon 11 U.S.C. section 105(a) (2011) which states: "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." The Bank disagrees and argues that a court's general powers do not authorize such treatment and additionally asserts that such a plan

term violates 11 U.S.C. section 1129(a)(1). The Bank contends that efforts to protect the Guarantors from collection actions have been relentless, which is evident from the adversary proceeding, state court litigation and Plan. It alleges that such conduct is contrary to the Bankruptcy Code because it affords protection to these non-debtors that at a minimum, impermissibly extends the automatic stay, and at a maximum, effectively operates as a discharge of the Insiders' Guarantees.

▪ Precedent exists for imposing restrictions on continued collection efforts by creditors in the context of a bankruptcy filing. *See A.H. Robins Co., Inc. v. Piccinin,* 788 F.2d 994 (4th Cir.1986); *In re Dow Corning Corp.,* 86 F.3d 482 (6th Cir. 1996); *C.H. Robinson Co. v. Paris & Sons, Inc.,* 180 F.Supp.2d 1002 (N.D.Iowa 2001). Approval of such non-debtor protections are rare and only permitted in extraordinary cases and under unique circumstances. *See In re Metromedia Fiber Network, Inc.,* 416 F.3d 136, 141–42 (2nd Cir. 2005); *Class Five Nev. Claimants v. Dow Corning Corp. (In re Dow Corning Corp.),* 280 F.3d 648, 657–58 (6th Cir.2002). A court "must weigh competing interests and maintain an even balance and must justify the stay by clear and convincing circumstances outweighing potential harm to the party against whom it is operative." *A.H. Robins Co., Inc.,* 788 F.2d. at 1003 (citations omitted). Whether such relief is appropriate must be determined on a case by case basis. *In re River Family Farms,* 85 B.R. 816, 819 (Bankr.N.D.Iowa 1987).

▪ A number of factors may be considered in determining whether extending injunctive relief to non-debtors is warranted. *In re Master Mortg. Inv. Fund, Inc.,* 168 B.R. 930, 934–35 (Bankr.W.D.Mo.1994). First, is whether there exists an "identity

---

**4.** Docket number 203, Second Amended Plan, Article III. 2 pp. 13, 14–15.

of interest between the debtor and the third party, usually an indemnity relationship, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate." *Id.* at 935 (citations omitted). Second, the non-debtor party has contributed or will contribute substantial assets to the reorganization, which in effect acts as consideration for the requested relief. *Id.; see also In re Karta Corp.*, 342 B.R. 45, 55 (S.D.N.Y.2006) (relying on asset contribution along with other unique circumstances). Third, that the requested injunction "plays an important part in the debtor's reorganization plan." *SEC v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 960 F.2d 285, 293 (2nd Cir.1992). Finally, that the majority of affected creditors have accepted the plan treatment and the plan provides for payment of substantially all of the claim owing to the enjoined party. *In re Master Mortg. Inv. Fund, Inc.*, 168 B.R. at 935.

In an effort to meet its burden of establishing the requisite circumstances to support its request for the protection of the Insiders, Riverbend raises several arguments. First, the Debtor contends that the restriction is justified based upon the identity of interests between the non-debtors and Riverbend. The Debtor states that the efforts of the principals are critical to the success of its Plan and that distractions related to litigation under the Guarantees will be detrimental to reorganization efforts. According to the testimony of Kim Holbrook, Operations Manager, she does not know where Meyers lives and has had no contact with him for over one year. She acknowledged that Pratt lived in both Iowa City, Iowa and in Florida and that he is not at Riverbend every day. She also stated that he assisted in management of the property through his involvement in maintenance, snow removal, leasing, and in the context of the bankruptcy proceeding. However, Ms. Holbrook was uncertain whether she would characterize Pratt as being involved in property management on a full-time basis.

Such generalizations do not rise to the level necessary to justify the injunctive relief requested in the Plan. Her testimony further indicated that during the time period prior to the bankruptcy filing, the Insiders appeared to hold differing opinions as to the third party management of the Debtor, and did not communicate effectively with each other or staff related to decisions involving Riverbend. There is no evidence to suggest that these issues have been resolved. It is apparent that the Insiders have not been united in their management vision for the business operation. While this fact is not dispositive, it indicates a lack of commitment by one or both of these individuals in the day to day operations of the Debtor. No other evidence was presented to substantiate the Insiders' involvement in Riverbend, either historically or on an ongoing basis post-confirmation. The record does not support a finding that the involvement of the Insiders is so substantial that continued collection efforts against them would adversely impact the Debtor's reorganization.

The Debtor also argues that the Bank intends to levy upon the Insiders' membership interests in Riverbend which would be potentially fatal to its reorganization. This statement was unsubstantiated by testimony, but does raise an issue of concern related to whether such an action by the Bank would affect property of the Debtor and materially impact its reorganization. Courts have recognized that although injunctions are only appropriate under limited circumstances, in some instances a stay against property owned by a non-debtor may be applied. *See C.H. Robinson Co.,*

180 F.Supp.2d at 1014 (citations omitted). Providing it could be shown that an injunction against such a levy is genuinely necessary, it would seem that the Plan language could be narrowly drafted to offer this discrete protection without the need for expansive injunctive relief.

Second, Debtor's counsel states that he has obtained similar injunctive relief in two chapter 11 cases in which he represented the debtor. Upon questioning by the Court, it was evident that the proceedings [5] in which Debtor's counsel successfully obtained injunctive relief on behalf of insiders were cases where no objection to that specific plan term was filed by an interested party. *See In re Metromedia Fiber Network, Inc.,* 416 F.3d at 142 (citing *In re Specialty Equip. Cos.,* 3 F.3d 1043, 1047 (7th Cir.1993)) (injunctive relief approved when affected creditor consents). Agreement by the Bank is clearly not present in this case.

Third, Debtor argues that pursuant to 11 U.S.C. section 1141 the Bank is bound by the confirmed Plan which provides that all assets dealt with by the "plan are free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor." (2011). The Debtor argues that

> [a]s a result, Security Bank will not be able to continue any action against Debtor or Debtor's personal guarantors, because the Plan is in effect, and all defaults have been discharged. In other words, Security Bank's only cause of action against the third party guarantors was due to a default by Debtor on an underlying note. *Once that note is cured and not in default under the confirmed Plan, there can be no cause of action against the third party.* [6]

Presuming that this position is correct, the injunctive relief requested by Riverbend is superfluous. What the Debtor appears to be seeking is an order from this Court to insure a result that would otherwise be under the jurisdiction of the Iowa District Court to determine. Such action is outside the authority and jurisdiction of this Court. *See In re G–I Holdings, Inc.,* 318 B.R. 66, 77 (D.N.J.2004) (bankruptcy court jurisdiction is limited to the matters identified at 28 U.S.C. § 1334).

■ Finally, upon reviewing all of the arguments involving the requested injunction, there is one point that is not addressed by either party. The Plan does not provide that the Guarantors are personally committing financial resources to the reorganization efforts of Riverbend. When deciding whether to extend injunctive relief to non-debtor insiders that have executed personal guarantees, courts consider the financial contributions of the non-debtors as an important factor. [7]

---

**5.** Docket number 204, Debtor's Memorandum and Points of Authorities in Support of its Second Amended Plan of Reorganization, p. 13 citing to *In re Red Rock Rubber,* Case No. 03–05598–lmj, Southern District of Iowa and *In re Bob Lenc Landscaping,* Case No. 08–03353–als. The latter case was confirmed prior to assignment to the undersigned Judge.

**6.** Docket number 204, Debtor's Memorandum and Points of Authorities in Support of its Second Amended Plan of Reorganization, p. 11.

**7.** *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d at 293 (court allowed injunction when non-debtors had settled law suits with own funds); *Karta,* 342 B.R. at 55 (substantial financial contribution of non-debtors was factor in favor of release of non-debtor claims, but not enough in the absence of other unique circumstances); *see also Gillman v. Continental Airlines, (In re Continental Airlines),* 203 F.3d 203, 212–13 (3rd Cir.2000) (analysis of cases where injunctions granted because of substantial financial contributions from non-debtor parties); *In re Linda Vista Cinemas,* 442 B.R. 724 (Bankr.D.Ariz.2010) (consider-

The provision of 11 U.S.C. section 105(d) relied upon by Riverbend is generally utilized to obtain an injunction prior to confirmation. *In re Linda Vista Cinemas, L.L.C.,* 442 B.R. 724, 744 (Bank.D.Ariz. 2010). The authority of the Court to enforce injunctive relief pursuant to this Code section is largely diminished or extinguished at the time of confirmation. *In re Wool Growers Cent. Storage Co.,* 371 B.R. 768, 776 (Bank.N.D.Tex.2007); *Boles v. Turner, (In re Enivid, Inc.)* 364 B.R. 139, 149 (Bankr.D.Mass.2007). Discharge is effective in most instances upon confirmation of the plan. 11 U.S.C. § 1141(d) (2011). Pursuant to 11 U.S.C. section 524(e), this discharge cannot apply to a non-debtor. In reconciling the application of these two Code provisions, the Court finds that Riverbend has failed to show unusual circumstances to justify the injunctive relief requested under 11 U.S.C. section 105, and that 11 U.S.C. section 524(e) controls. Confirmation of the Plan is denied for failure to meet the standard set forth in 11 U.S.C. section 1129(a)(1).

### 11 U.S.C. section 1129(a)(3)

■ The Bank objects to the Plan as not being filed in good faith as required by 11 U.S.C. section 1129(a)(3). "The term 'good faith' is not defined by the Bankruptcy Code, but in this Circuit, a chapter 11 Plan is considered proposed in good faith if there is a reasonable likelihood that the plan will achieve a result consistent with the standards prescribed under the Code." *Cutcliff v. Reuter (In re Reuter),* 427 B.R. 727, 770 (Bankr.W.D.Mo.2010) (citing *Hanson v. First Bank of South Dakota,* 828 F.2d 1310, 1315 (8th Cir.1987) (overturned on other grounds)). "The important inquiry is the plan itself." *Id.* at 770. The court must determine "whether the plan constitutes an abuse of the provisions, purpose or spirit of the Code." *Id.* The court should judge each case on its own facts after considering the totality of the circumstances surrounding the plan and the bankruptcy filing.[8] *Id.*

■ The Supreme Court has explained that the purposes of allowing "business debtors" to reorganize through Chapter 11 are to "revive the debtors' businesses and thereby preserve jobs and protect investors" and to "maximize the value of the bankruptcy estate." *Toibb v. Radloff,* 501 U.S. 157, 163, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991). Courts have considered Debtors' "motivation and sincerity (or lack thereof) in seeking reorganization and formulating the Plan" when determining whether there was bad faith. *Cutcliff,* 427 B.R. at 771; *see also Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.),* 235 F.3d 375, 381 (8th Cir.2000) ("the powerful equitable weapons of the bankruptcy court should be available only to those debtors with clean hands"). "Chapter 11 is intended for valid reorganization

---

ing substantial contribution of non-debtors as factor weighing in favor of injunction); *In re Wool Growers Central Storage Co.,* 371 B.R. 768, 777–78 (Bankr.N.D.Tex.2007) (contribution of non-debtors was a substantial factor, but not enough to provide the authority to allow the non-debtor release).

8. There is a distinction "between the good faith that is a prerequisite to filing a Chapter 11 petition and the good faith that is required to confirm a plan of reorganization." *In re Sagewood Manor Assocs. Ltd. P'ship.,* 223 B.R. 756, 761 (Bankr.D.Nev.1998). A chapter 11

petition may be dismissed for cause under 11 U.S.C. § 1112(b) "if it appears that the petition was filed in bad faith." *Id.* (citing *In re Stolrow's Inc.,* 84 B.R. 167, 170 (9th Cir. BAP 1988)). The factors listed on page 23 of Bank's Objection, filed at docket number 171, are pertinent to a consideration under section 1112(b), not section 1129(a)(3). A motion to dismiss under section 1112(b) is not properly before the Court, therefore, the "bad faith" factors listed in the Bank's Objection will not be considered by the Court.

of 'financially troubled businesses,' not to permit financially solvent companies to 'rapidly conclude litigation to enable a continuation of their business.'" *Cutcliff,* 427 B.R. at 771 (citing *In re Cedar Shore Resort, Inc.,* 235 F.3d 375, 380 (8th Cir. 2000)). Nothing in the record suggests that Riverbend does not have "clean hands" in submitting its Plan. The goal of the Plan is consistent with the objectives of the Code. This objection to confirmation is overruled.

### 11 U.S.C. Section 1129(a)(11)

Whether a debtor has the ability to meets its plan obligations is essential to a determination of feasibility, and is frequently one of the objections raised to plan confirmation. The relevant statutory language states: "Confirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization." 11 U.S.C. § 1129(a)(11) (2011). "The purpose of this section of the Code is to prevent confirmation of visionary schemes which promise creditors more under a proposed plan than that which the debtor can possibly attain after confirmation." *In re Crosscreek Apts.,* 213 B.R. 521, 539 (Bankr.E.D.Tenn.1997). A substantial amount of testimony was received on the issue of feasibility.[9] Riverbend places the blame for its past financial difficulties on inefficient and ineffective third party management that had been in place for some time prior to filing. The Bank does not dispute that there were issues with outside management[10], but it argues that this fact alone is not sufficient to satisfy the Debtor's burden to prove that its Plan is feasible.

The Debtor provides projections based upon a 95% occupancy rate of its rental units which are varied in size and lease rates. Additionally, the Debtor has reduced expenses, and implemented an improved management system. The cash projections were prepared based upon an evaluation of the Debtor's operation and a belief that these figures were reasonable and could be attained.[11] The Debtor and both appraisers agree that the rates being charged by the Debtor were below the standard market rate. Riverbend states that its goal is to raise rents to correct this issue over a period of time.

The Bank focused on the information contained in the current rent rolls which, it argues, do not support the cash flow projections. The rent rolls provide a snapshot of lease payments received as of a specific date. Although this data, may indicate that the cash flows are optimistic, these reports do not establish that Riverbend will be unable to meet its estimated revenues. Both parties cite to economic factors, including unemployment and foreclosure rates which may affect the revenue projections. Any conclusions that can be drawn from this information result in a neutral finding as to either party's arguments. The combination of active marketing, decreasing vacancies and expense efficiencies under Debtor's in-house management show that the Project has experienced improvement since turnover of the operation from Dial. The decision to increase rents to market rate should also result in continued financial improvement.

---

9. Some discussion of feasibility was included in the testimony of the parties' experts called in support of the dispute involving the calculation of the appropriate interest rate. This testimony was also considered in making a determination on plan feasibility.

10. Counsel for the Bank stated at hearing that it would stipulate to the issues raised by Riverbend related to outside management of Riverbend.

11. Witness: Eric C. Brewer, CPA.

Based upon the evidence presented, the Court is persuaded that the Debtor has established a reasonable prospect of success in its efforts to achieve it projected revenues.

Riverbend's failure to include appropriate expense allowances and reserve funds is also cited by the Bank in support of its argument that the cash flow projections are deficient. The basis for the Bank's position stems from a comparison of figures from financial data gathered prior to the Debtor's filing and during a time of alleged troubled management. Although the allowances projected are not in an amount that the Bank finds satisfactory, the Debtor's calculation of these expenses appears to have involved a consideration of historical data, an evaluation of its ongoing business operations and an analysis of where reductions could be made to improve profitability. Progress has been made to eliminate unnecessary or duplicative costs. This is especially apparent from the elimination of the third party management fee due to the Debtor's direct involvement in controlling tenant applications, lease payments, turnover costs and miscellaneous expenditures. Dial did not hold tenant deposits in trust as required under Iowa law. Riverbend has been successful in correcting this issue, and has returned tenant deposits from its operating budget into a segregated bank account. As this trust account balance reaches the amount that reflects total deposits paid, this continuing expense will be eliminated.

Notwithstanding the Debtor's progress, the monthly reports and cash flow projections evidence a negative balance. Total receipts are substantially below the projected net income from rentals on the amended cash flows relied upon by the Debtor. At the time of hearing the most recent monthly report indicated a cumulative "Case to Date" loss of $242,947. The report further reflects past due accounts payable in the amount of $72,738.[12] This data is inconsistent with the cash flow projections which provide for sufficient funds to meet ongoing operating expenses and make payments contemplated under the Plan.[13]

Riverbend's use of third party property managers for a substantial period of time prior to its bankruptcy filing complicates the evaluation of feasibility. The primary difficulty arises in making meaningful comparisons between the available historical data and the limited post-petition financial information that is based upon a new business model of in-house management. A plan must be workable and offer "a reasonable prospect of success" in order to meet the feasibility standard. *In re Richards*, No. 03–02487, 2004 WL 764526, at *2–3, 2004 Bankr.LEXIS 388, at *7 (Bankr.N.D. Iowa April 2, 2004). "The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *Id.* (citing *In re Clarkson*, 767 F.2d 417, 420 (8th Cir.1985)). "The success of a debtor's proposed plan need not be guaranteed, but a bankruptcy court cannot approve a plan unless there is at least a reasonable likelihood of success." *In re Reuter*, 427 B.R. at 772. This test is meant to prevent

---

**12.** The Debtor's reports are based upon an accrual method of accounting. Even after taking this procedure into account, it is clear that there are numerous expenses that are not being paid on a timely basis.

**13.** The record does not officially include the monthly operating reports that may have been filed since the hearing on confirmation which may provide additional insight as to the Debtor's ongoing ability to meet the trends it has projected. Based upon the rulings in this order, judicial notice of the post-hearing monthly reports was not deemed necessary.

confirmation of plans based upon speculation. Financial uncertainty is not a bar to confirmation, but there must be a practical showing that post-confirmation obligations can be met. "While a reviewing court must examine 'the totality of the circumstances' in order to determine whether the plan fulfills the requirements of § 1129(a)(11), only a relatively low threshold of proof is necessary to satisfy the feasibility requirement." *In re Sagewood Manor Assocs. Ltd. P'ship.*, 223 B.R. 756, 762 (Bankr.D.Nev.1998) (citations omitted). Fluctuations, both higher and lower, in actual revenues and expenses are inherent to business cash flows. The Debtor has implemented actions to increase its profitability through raising its lease rates, reducing vacancies, eliminating management expenses and making other reductions that positively impact its budget. Under the circumstances of this proceeding, the figures utilized in the cash flow projections appear reasonably attainable, and are not solely based upon speculation, which satisfies this confirmation standard. The objection to confirmation based upon feasibility of the Second Amended Plan is overruled.

*Application of 11 U.S.C. section 1129(b)*

Several issues arise related to the Debtor's ability to obtain confirmation in spite of the Bank's objections and the balloting. The relevant matters in reaching a decision under 11 U.S.C. section 1129(b) are therefore reviewed to determine whether the Code provisions have been satisfied.

*Claim Allowance*

The Debtor's Plan proposes to treat Security Bank's claim as fully secured. Security Bank will be paid in full one hundred percent pursuant to the terms of the Promissory Note and Loan Documents, subject to the following modifications: (1) the term for payment on the Note shall be extended to a maturity date that is fifteen years subsequent to the Effective Date; (2) interest shall accrue on the outstanding principal balance owed under the Note at the fixed rate of 4.25% per annum from the Effective Date until the Promissory Note is paid in full; (3) the Debtor shall make equal monthly payments on the outstanding principal and interest owed on the Modified Promissory Note based on a thirty-year amortization schedule, with the first eighteen months of the Modified Promissory Note term to be interest-only payments based on the fixed interest rate established herein; (4) all pre-petition payment or property tax-arrearages, and any post-petition payment or property tax arrearages shall be capitalized and added to the outstanding principal balance owed on the Note as of the Effective Date. (Debtor's Second Amended Plan of Reorganization Dated December 13, 2010 III(C)(2)).

In order for the Plan to be fair and equitable with respect to the class of secured claims, the plan must provide that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property. 11 U.S.C. § 1129(b)(2)(A)(i)(II) (2011).

In the Stipulation and Consent Order on Proof of Claim No. 4 filed at docket number 248 ("Stipulation"), the parties agree that the total of the Bank's Pre–Petition Claim and Post–Petition Interest Claim is $9,468,601.71 and that the Bank "shall have an allowed secured claim, pursuant to 11 U.S.C. § 506" for that amount. The Stipulation continues, "[f]or purposes of any plan of reorganization or liquidation confirmed by this Court, Security Bank's Allowed Secured Claim shall be deemed and treated in all respects as an allowed

secured claim, pursuant to § 506 of the Code."

■■ 11 U.S.C. § 506(a)(1) provides in relevant part,

> [a]n allowed claim of a creditor secured by a lien on property in which the estate has an interest ... is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to set off is less than the amount of such allowed claim.

"[B]y its terms, section 506(a) requires the bifurcation of an ostensibly secured claim into 'secured' and 'unsecured' portions if the value of the creditor's collateral is less than the amount of its claim." 4–506 *Collier on Bankruptcy* ¶ 506.03 (2011). The determination of the secured versus the unsecured components of a claim generally requires a valuation of the property.

Section 506(a) concerns the valuation of claims in the context of determination of secured status. *See In re Madera Farms P'ship,* 66 B.R. 100, 103 (9th Cir. BAP 1986). "[T]he value of the property for one purpose may not be the same as its value for another purpose." *Id.* There are different motivations behind valuations for a motion for relief from stay under 11 U.S.C. section 362 and a valuation for purposes of confirmation. In the section 362 context, a creditor will want to show that there is no equity in the property by making the property have a low valuation. 3–362 *Collier on Bankruptcy* ¶ 362.07 (2011). On the other hand, in a confirmation proceeding, the creditor will want to have a

fully secured claim and will attempt to prove the highest value for the collateral. *Id.*

Here, the hearing on the motion for relief from stay and the confirmation hearing were combined, and the Bank argued that the Debtor had no equity in the Project in an attempt to meet its burden on the motion for relief from stay. After the conclusion of the hearing, the parties stipulated to the amount of the Bank's "allowed secured claim" in the Stipulation. For purposes of Plan confirmation, the value of the Bank's claim will be the amount to which the parties stipulated, and the Bank will be treated as fully secured.[14] Consequently, the issue of whether cram down can occur over the objection of an unsecured creditor will not be addressed.

### Cram Down of Secured Claim

If a debtor meets all of the requirements enumerated under 1129(a), except the voting provision set forth at 1129(a)(8), confirmation may still be obtained over a creditor's objection through cram down if its plan treatment is not discriminatory, and is fair and equitable. The Code requires that [w]ith respect to a class of secured claims, the plan provides—

> that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the

---

14. Although the testimony presented at the hearing from both parties' expert witnesses supported a finding that the value of the Project is less than the amount of the Bank's claim, the court will not determine the value of the property. The parties agree that the Bank is fully secured, so it will be treated as such for purposes of Plan confirmation.

plan, of at least the value of such holder's interest in the estate's interest in such property;

for the sale, subject to section 363(k) of this title, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds [under the above clauses] or

for the realization by such holders of the indubitable equivalent of such claims.

11 U.S.C. § 1129(b)(2) (2011). Except as addressed herein, the issue of lien retention is not in dispute. The Plan provides that the Bank will retain its liens post confirmation.[15] The Bank believes that treatment of its claim does not conform to this statutory requirement in the following particulars: (1) the value of its claim is not preserved due to the unreasonable repayment terms proposed in the plan; (2) the interest rate is too low and not appropriately calculated; and (3) the Plan permits the Debtor to sell collateral and withhold payment of proceeds notwithstanding the Bank's lien.

### Claim Treatment

 Relevant to this inquiry is the amount and timing of principal and interest payments. Debtor proposes to pay only interest for the first eighteen months of the modified promissory note term. The Bank argues that this treatment is unfair. A court must look at the plan as a whole and make a determination of fairness on a case-by-case basis. *Great Western Bank v. Sierra Woods Group*, 953 F.2d 1174, 1177 (9th Cir.1992). Courts have even held that plans including negative amortization may be fair and equitable under certain circumstances. *See Great*

*Western Bank*, 953 F.2d at 1176. Negative amortization occurs when "part or all of the interest on a secured claim is not paid currently but instead deferred and allowed to accrue, with the accrued interest added to the principal and paid when income is higher." *Corestates Bank, N.A. v. United Chem. Techs.*, 202 B.R. 33, 52 (Bankr. E.D.Penn.1996) (citing *Great Western Bank*, 953 F.2d at 1176). "Even when a debtor defers payments of interest on its debt obligation, the deferred amount can be capitalized at a rate of interest which enables the deferred amount to equal the present value of the creditor's allowed secured claim." *Great Western Bank*, 953 F.2d at 1176. Courts may not decide that plans which include negative amortization are per se unfair. *Id.* at 1174–75. It follows, then that courts may not decide that plans providing for payments of interest-only for periods of time are per se unfair.

A court must examine the overall fairness of the payments under the proposed plan. For example, in *In re IPC Atlanta Ltd. P'ship*, the secured creditor objected to the plan because, among other things, the loan was extended for three years beyond the original term and provided for interest-only payments for the first two years. 142 B.R. 547, 555–56 (Bankr. N.D.Ga.1992). The secured lender argued that this placed substantially all of the risk of nonperformance on it. The court held that these terms were not unfair or inequitable because the lender would be receiving an adequate rate of interest to receive the present value of its claim and the lender retained the right to foreclose on the property if the debt service payments were not made. *Id.* Applying this analysis to the case at bar, if the interest rate and

---

**15.** This treatment also comports with the parties' stipulation for use of cash collateral which provided replacement liens.

final repayment amount are sufficient, the interest-only payments are not unfair or inequitable. The objection to Plan confirmation on the ground of interest only payments as being unfair and inequitable is overruled.

### Interest Rate

The Supreme Court has addressed calculation of the cram down interest in the context of a Chapter 13 filing related to the treatment of a motor vehicle loan. *Till v. SCS Credit Corporation*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004). Many commentators and cases have analyzed whether the decision reached in Till is applicable to a chapter 11 proceeding.[16] Notwithstanding this dicta, the principles discussed in *Till* are instructive and can be applied to determine whether a chapter 11 plan proposes an appropriate interest rate. *See In re Prussia Assocs., L.P.*, 322 B.R. 572, 587 (Bank.E.D.Penn.2005). In establishing a formula approach the Supreme Court stated:

> [U]nlike the coerced loan, presumptive contract rate, and cost of funds approaches, the formula approach entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings. Moreover, the resulting "prime plus" rate of interest depends only on the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan, not on the creditor's circumstances or its prior interactions with the debtor. For these reasons, the prime-plus or formula rate best comports with the purposes of the Bankruptcy Code.

*Till*, 541 U.S. at 479–80, 124 S.Ct. 1951. This analysis would appear to be equally applicable to cases arising under Chapters 11, 12 or 13.

 Of primary importance is the requirement that a plan provide that the creditor be paid, as of the effective date of the plan, the full value of its claim. 11 U.S.C. section 1129(b)(2)(A)(i)(II) (2011); *Till*, 541 U.S. at 473, 124 S.Ct. 1951. When immediate payment is not contemplated, there are various factors that may be considered to determine whether a plan provides for payment of the full claim value. These factors include the time value of money, risk of non-payment, and inflation. A court must evaluate the relevant risk factors in light of "the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Till*, 541 U.S. at 479, 124 S.Ct. 1951. A specific percentage amount to account for various risk factors was not announced in Till, however, the general consensus that has emerged provides that a one to three percent adjustment to the prime rate as of the effective date is appropriate. *Id.* at 480 (citing to general consensus among courts of a 1% to 3% risk adjustment); see generally Gary

---

16. *See Till v. SCS Credit Corp.*, 541 U.S. 465, 477, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004) (at footnote 14 there is discussion of whether an efficient market would produce a different result in a chapter 11 proceeding). Commentaries on the applicability of Till in chapter 11 proceedings followed the Court's opinion. Jason A. Pill, *Untill [sic] the Footnote was Written: The Effect of Till v. SCS Credit Corporation on 11 U.S.C. § 1129(B)(2)*, 26 Emory Bankr.Dev. J. 267 (2010); Thomas R. Fawkes & Steven M. Hartmann, *Revisiting Till: Has a Consensus Emerged in Chapter 11s?*, 27–Aug. Am. Bankr.Inst. J. 28, (July/Aug. 2008); Ronald Greenspan & Cynthia Nelson, *"Untill" We Meet Again, Why the Till Decision Might Not Be the Last Word on Cramdown Interest Rates*, 23 Jan. Am. Bankr.Inst. J. 48 (Dec/Jan 2005); Daniel Carragher, *What The Supreme Court's Prime Plus Ruling Means for Chapter 11*, 23–August Am. Bankr.Inst. J. 26 (July/August 2004); Michael Cook & Leslie Chervokas, *Supreme Court Disappoints Secured Lenders*, 21 Bankruptcy No. 9 Strategist 1 (July 2004).

W. Marsh & Matthew M. Weiss, *Chapter 11 Interest Rates After Till*, 84 Am. Bankr. L.J. 209, 231 (Spring 2010) ("[m]ost courts have relied on *Till* to impose risk adjustments of between 1% and 3%."). The Bank alleges that the proposed interest rate provided for its claim is not appropriately calculated because *Till* did not mandate, nor limit, the percentage to be applied in adjusting for risk in the context of a chapter 11 proceeding. The Bank's position relies upon the theory of an efficient market existing for the loan which would provide a more accurate measure of the correct interest rate. *See In re Seasons Partners, L.L.C.*, 439 B.R. 505, 519 (Bank. D.Ariz.2010). Riverbend disputes that this is the correct standard to be applied.

Both parties presented expert testimony in support of their respective positions. Andrew Frank Thompson, Ph.D. ("Thompson") testified on behalf of Riverbend. He demonstrates substantial experience in mathematics, financial economics, operations research, applied statistics and actuarial science. He has previously been engaged to evaluate the financial viability of various entities, including multi-family housing projects. In preparing his opinion, Thompson reviewed financial information concerning the Debtor and relevant court decisions related to the calculation of interest rates.[17] Upon consideration of these items, Thompson stated that based upon the current prime rate with an adjustment for risk the appropriate interest rate for the Bank's secured claim is in the range of 4.25% to 4.75% at the time of the hearing.

In reaching this conclusion, he stated that the risk adjustment is dependent upon the strength of the reorganization plan. A zero percent risk factor indicates zero risk, while the higher amount of three percent indicates highest risk and a probability that the plan will not succeed. Thompson identifies poor management and discounts put in place by Dial as being the basis for his conservative opinion that the Plan proposed by Riverbend represents a moderate risk. The Court notes, however, that in reaching this conclusion, he voiced concerns about how quickly the Debtor could increase rental rates and realize collection of previous rental losses. During cross-examination it became apparent that Thompson utilized incorrect information that was derived from the Debtor's monthly operating reports in reaching his conclusion. Further, it became clear that he gave little weight to the historical financial information in favor of the more recent financial data.

The Bank relies upon the testimony of its expert, Michael Caffrey ("Caffrey"). This expert has extensive background in originating commercial loans and developing mortgage backed securities for insurance companies, has recently engaged in some consulting for lenders with distressed properties, and owns a 58–unit rental property in Kansas City that was built in the mid 1960s. In preparation, this expert also reviewed cases and tested the market place for lending on similar projects and relevant underwriting requirements. Caffrey takes issue with various expense projections provided by the Debtor. He also disagrees with the two appraisers' conclusions that Riverbend's rents are below market rate. Although he agrees that it is not unusual to mis-forecast budget projections, he states that the Debtor has under funded various expense categories, especially in the reserve fund, and that based upon his experience there would need to be substantial adjustments made to qualify for a loan under a stan-

---

17. *Till v. SCS Credit Corporation*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004); *United States of America v. Doud*, 869 F.2d 1144 (8th Cir.1989).

dard underwriting process. To support his opinion, Caffrey created a projection that would be considered sufficient for underwriting purposes. This document includes increased reserve funding, a management fee and other costs that he states a lender would require in order to approve financing.

Caffrey's opinion relies heavily on historical financial data. The industry term for such an evaluation is called "rearview underwriting." Caffrey explains that this analysis is appropriate because absent exceptional circumstances, changes from year to year are not expected, and conclusions are based upon consistencies and trends. Caffrey also stated that it was easier to follow and find support in Dial's reports and that he found the Debtor's bankruptcy reports challenging to review. As previously noted, because the historical data is gathered from the time period when a third party property manager was in place, it is of limited comparative value to the Debtor's future cash flow projections. For example, Riverbend contends that during this time period, vacancies were low and expenses were high due to Dial's involvement. This evidence is virtually undisputed by the Bank. Additionally, in one of his comparative reports, Caffrey included a management fee because any lender would require that a third party entity be involved based upon applied underwriting standards. Clearly, including this fee is contrary to Riverbend's proposed business plan and is therefore not relevant to the comparative cash flow projection for purposes of calculating the allowable interest rate.

Utilizing Fannie Mae and Freddie Mac as possible lending sources Caffrey concludes that an interest rate in the amount of 7.625% at the time of hearing is appropriate.[18] Caffrey's conclusion is based upon his opinion that *Till* does not limit the percentage amount that can be applied to the risk adjustment. While this is technically a correct statement, the case law suggests that in order to apply something other than the formula approach, an efficient market must exist. For all practical purposes most debtors would not qualify for a loan using standard underwriting requirements which is the basis of Caffrey's opinion. The burden to prove an efficient market rests with the Bank. *Till*, 541 U.S. at 479, 124 S.Ct. 1951. The Bank has not presented evidence that establishes that Fannie Mae or Freddie Mac provide debtor-in-possession lending, and therefore these sources have not been shown to be an efficient market for financing in the context of a bankruptcy reorganization. In reviewing Caffrey's testimony, it was clear that he had strong personal opinions about the Debtor's operations. In large part these viewpoints appear to be based upon standard underwriting policies and his involvement in a partnership that owns a rental property. He admitted that he did not have a working knowledge of the Bankruptcy Code, was not familiar with the balancing of parties' rights under the bankruptcy process and did not consider the decreasing property taxes or personal guarantees in arriving at an appropriate interest rate.

The Court is persuaded by Thompson's testimony that the problem with the Bank's calculation of the interest rate is that it is focused entirely on the concept of a lender considering a new loan. The filing of a chapter 11, the ability to adjust obligations under the Code, along with substantive changes to the business model

---

**18.** His original report included an interest rate of 6.26% which was based upon relevant data available as of the report date.

would seem to constitute exceptional circumstances which the Bank's expert identifies as causing fluctuations in year to year financial data.

In this proceeding, the Court adopts the formula approach as enunciated in Till and consistent with the precedent in this Circuit [19] for purposes of calculating the appropriate interest rate. Upon consideration of the totality of the circumstances involving the Debtor's reorganization, and based upon a lack of relevant historical financial data, Thompson's adjustment to the prime rate is not sufficient. His view was that an appropriate interest rate gives a debtor an opportunity to rehabilitate, or "right the ship." Such a statement appears to contemplate that the interest rate must be low enough to enable a debtor to cash flow its reorganization effort, and minimizes the concept of establishing a rate that accounts for the risk to the creditor. The Court finds that the appropriate interest rate is the prime rate as of the effective date of the Plan plus two and one-half percent (2.5%).[20]

### Lien Proceeds

The Debtor's Plan provides two options for treatment of the five vacant lots held as collateral for the Bank's claim. Within five years, and at Riverbend's discretion, the five lots will either be sold for the "highest and best price" or surrendered to the Bank. The Plan goes on to state:

If the Reorganized Debtor is successful and sell [sic] the five (5) lots, either individually or altogether, the Net Sale Proceeds from said sales, less ten percent (10%) holdback or carve-out for the Reorganized Debtor, shall be delivered to Security Bank upon closing. Net Sale Proceeds shall be defined as the Gross Sale Proceeds, less payment of real estate commissions, property taxes, and the usual and customary costs of sale. Provided any such sale is commercially reasonable, and for a value per square foot within ten percent (10%) of Security Bank's appraisal of such land, Security Bank shall be obligated to partially release its mortgage, liens and encumbrances on said property, so that Riverbend can convey merchantable title to its proposed buyer.

. . .

Regardless of which option is employed, upon sale or surrender of the five (5) lots, upon delivery of the Net Sale Proceeds or the real estate, the amount owed by Riverbend to Security Bank at that time shall be recalculated, based on the respective credit, and the Modified Promissory Note shall be reamortized and the monthly payments by Riverbend shall be reduced accordingly.[21]

This Plan provision is in direct contravention of the plain statutory language contained in 11 U.S.C. section 1129(b)(2)(A)(ii) (2011) which provides that a creditor must retain its lien and that the lien attaches to the sale proceeds of its collateral. Debtor's proposed treatment of sale proceeds that includes a holdback of funds, to which the Bank does not consent, is neither fair nor equitable under the cram down requirements of the Code. Fur-

---

**19.** *United States of America v. Doud,* 869 F.2d 1144 (8th Cir.1989). The interest rate calculated pursuant to the *Doud* formula is consistent with the interest rate calculated under *Till* due to the similarity in the amounts of the prime rate and 15 year treasury bonds at the time of hearing.

**20.** As of the date of this opinion the rate is calculated at 5.75%.

**21.** Debtor's Second Amended Plan of Reorganization, Art. IV, ¶ C.

ther, the Plan proposes a process that the parties will certainly find difficult, if not completely unworkable. The Debtor appears to demand an adjustment to the promissory note based upon a potential surrender of the lots to the Bank. Even if this treatment was found to be acceptable, it is improbable that the parties could agree on the value of the surrendered lots or an appraised value. The Debtor proposes that the Court be involved in the valuation of the lots, which may occur long after the proceeding has been closed by final decree. The parties have not requested that the Court value the lots as of the time of confirmation. There is a possibility that the lots may increase, or decrease, in value over the next five years. Based upon the Debtor's control in disposing of the lots over the next five years, its attempt to retain proceeds subject to the Bank's lien without its consent, and the possibility of valuation being deferred for a substantial period of time, the Plan's treatment of this portion of the Bank's claim and its related collateral is neither fair nor equitable. The objection related to confirmation of the Plan pursuant to 1129(b)(2)(A)(ii) and this Plan provision is sustained.

Based upon the foregoing it is hereby ORDERED that

1. Confirmation of the Debtor's Second Amended Plan is denied.

2. Ruling on the Motion for Relief from Stay is reserved.

3. Not later than 30 days from the date of this ruling the Debtor shall file its amended plan, if any, that conforms to this ruling.

4. A telephonic status conference related to the Motion for Relief from Stay and the status of the pending

Chapter 11 proceeding will be conducted on May 31, 2011 at 4:30.