In the matter of Jeffrey J. & Kimber L. CANTWELL, Debtors.

No. 03–45208/JHW.

United States Bankruptcy Court, D. New Jersey.

Jan. 5, 2006.

689

William Mackin, Esq., Woodbury, NJ, for the Debtor.

Harlan L. Cohen, Esq., Starr, Gern, Davison & Rubin, Roseland, NJ, for UBIC.

Richard P. Norton, Esq., Reed Smith LLP, Newark, NJ, for the Creditors' Committee.

## OPINION ON CHAPTER 11 CRAM DOWN INTEREST RATE

JUDITH H. WIZMUR, Chief Judge.

The debtors' Chapter 11 plan has been confirmed in this case. Preserved at confirmation was the issue to be resolved herein, i.e. the interest rate to be paid to the second mortgage when its claim is paid in full, in consummation of the plan.

### FACTS

In August 2000, the Cantwells entered into a settlement agreement with the Universal Bonding Insurance Company ("UBIC") with respect to litigation pending in the New Jersey Superior Court, whereby the Cantwells agreed to pay UBIC $2.0 million in four equal annual payments of $500,000 each, starting on August 1, 2000. The promissory note carried interest at the rate of 7% with a default rate of 12%. UBIC's claim was secured by a second mortgage lien on the Cantwells' real property located at 532 Bay Avenue, Ocean City, New Jersey.

At some point prepetition, the Cantwells defaulted on their agreement with UBIC. The debtors filed a voluntary petition under Chapter 11 of the Bankruptcy Code on October 27, 2003. They listed UBIC as a secured creditor holding a claim in the amount of $650,000.00. The value of the Ocean City property was scheduled, as amended, at $1.8 million. It appears that the equity cushion in this property is ap-

proximately $520,000 (FMV—$1.8 million; 1st mortgage held by Washington Mutual Mortgage Co. in the amount of $630,437.46; 2nd mortgage held by UBIC in the amount of $650,000). UBIC does not dispute either the amount designated by the debtors as its claim, or the value of the Ocean City property.

The debtors' Chapter 11 plan was confirmed on November 28, 2005, subject to the resolution of the appropriate interest rate to be paid to UBIC on its claim until it is paid. As confirmed, the plan contemplates that the debtors will refinance the property in one year, at which time the UBIC claim will be paid in full, with interest. Until the refinancing is complete, the debtors will make monthly adequate protection payments in the amount of $1,000 to UBIC. UBIC will also be allowed to continue its foreclosure proceedings up to the point of entry of a judgment, pending the refinancing.

UBIC contends that both the loan documents and New Jersey state law support a post petition interest rate of 12%. Because section 506(b) is silent regarding the rate of interest that should apply to oversecured creditors, UBIC maintains that most courts favor a presumption of the contract rate, in this instance, the default rate.

The debtors assert that the court should be guided by the U.S. Supreme Court's decision in *Till v. SCS Credit Corp.*, 541 U.S. 465, 124 S.Ct. 1951, 158 L.Ed.2d 787 (2004) and adopt the "formula method" for calculating the cram down interest rate. Debtors contend that there is no "efficient market" for this type of refinancing. They recommend setting the interest rate at the prime rate as of the date of confirmation, with no adjustment for risk. Debtors contend that the risk of nonpayment is negligible, in light of the equity cushion in the property, the limited time to refinance, the

right to continue foreclosure proceedings and the adequate protection payments. The Official Committee of Unsecured Creditors joins in support of the debtors' position.

### DISCUSSION

The threshold issue is whether the *Till* decision, delivered in the context of a Chapter 13 case, is nonetheless controlling in a Chapter 11 case on the question of the appropriate cram down interest rate.

In *Till*, the Chapter 13 debtors sought to pay back a truck loan over the course of the Chapter 13 plan by making payments equal to the value of the truck plus interest calculated at a rate of 9.5%, reflecting a prime rate of 8.0% and a risk factor of 1.5%. The creditor sought the contract loan rate of 21%, offering evidence that the contract rate was the rate used for subprime loans, or loans to borrowers with poor credit ratings.

Under section 1325(a)(5)(B), where the debtor proposes to retain a secured creditor's collateral, the secured creditor is required to receive property in the plan whose total "value, as of the effective date of the plan, . . . is not less than the allowed amount of such claim." 11 U.S.C. § 1325(a)(5)(B)(ii). The Supreme Court recognized that making payments that equal or exceed the present value of the claim "is easily satisfied when the plan provides for a lump-sum payment to the creditor." 541 U.S. at 474, 124 S.Ct. at 1958. With payments over time, however,

A debtor's promise of future payments is worth less than an immediate payment of the same total amount because the creditor cannot use the money right away, inflation may cause the value of the dollar to decline before the debtor pays, and there is always some risk of nonpayment. The challenge for bankruptcy courts reviewing such repayment

schemes, therefore is to choose an interest rate sufficient to compensate the creditor for these concerns.

*Id.*

In choosing the appropriate interest rate, the Court noted three significant considerations. First, the Bankruptcy Code includes other present value provisions and the Court assumed the likelihood "that Congress intended bankruptcy judges and trustees to follow essentially the same approach when choosing an appropriate interest rate under any of these provisions." *Id.*, 124 S.Ct. at 1958–59. In this regard, the Court cited to provisions in sections 1129(a), 1129(b), 1173(a), 1225(a) and 1228(b). *Id.* at 475 n. 10, 124 S.Ct. at 1959 n. 10. Second, the Court recognized that "Chapter 13 expressly authorizes a bankruptcy court to modify the rights of any creditor whose claim is secured by an interest in anything other than 'real property that is the debtor's principal residence.'" *Id.* at 475, 124 S.Ct. at 1959 (citing to 1322(b)(2)). Third, the Court read "the cramdown provision [to] mandate[ ] an objective rather than a subjective inquiry." *Id.* at 476, 124 S.Ct. at 1959. The Court explained that although the Code

> entitles the creditor to property whose present value objectively equals or exceeds the value of the collateral, it does not require that the terms of the cram down loan match the terms to which the debtor an creditor agreed prebankruptcy, nor does it require that the cram down terms make the creditor subjectively indifferent between present foreclosure and future payment. Indeed, the very idea of a "cram down" loan precludes the latter result: By definition, a creditor forced to accept such a loan would prefer instead to foreclose. Thus, a court choosing a cram down interest rate need not consider the cred-

itor's individual circumstances, such as its prebankruptcy dealings with the debtor or the alternative loans it could make if permitted to foreclose.

*Id.* at 476–77, 124 S.Ct. at 1959–60.

Analogizing to Chapter 11, the Court remarked in footnote 14 that

> This fact helps to explain why there is no readily apparent Chapter 13 "cram down market rate of interest": Because every cram down loan is imposed by a court over the objection of the secured creditor, there is no free market of willing cram down lenders. Interestingly, the same is not true in the Chapter 11 context, as numerous lenders advertise financing for Chapter 11 debtors in possession. (citations omitted). Thus, when picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce. In the Chapter 13 context, by contrast, the absence of any such market obligates courts to look to first principles and ask only what rate will fairly compensate a creditor for its exposure.

*Id.* at 477 n. 14, 124 S.Ct. at 1960 n. 14.

With these three considerations in mind, the Court rejected the coerced loan, the presumptive contract rate, and the cost of funds approaches, adopting instead the formula approach. The formula approach "begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default." *Id.* at 478–79, 124 S.Ct. at 1961. The Court added that "if the court could somehow be certain a debtor would complete his plan, the prime rate would be adequate to compensate any secured creditors forced to accept cram down loans." *Id.* at 479 n. 18,

124 S.Ct. at 1961 n. 18. Otherwise, because there is some risk that the debtor will be unable to pay, the court should add a percentage to reflect the relative risk of nonpayment. The Court did not set a scale for the risk factor, but noted that "other courts have generally approved adjustments of 1% to 3%." *Id.* at 480, 124 S.Ct. at 1962.

Following the decision in *Till,* questions have arisen, as they do here, as to whether or not the *Till* analysis applies beyond the Chapter 13 context to include application in Chapter 11 cases. *See, e.g.,* Richard E. Mikels and Adrienne K. Walker, *The Developing Impact of Till v. SCS on Chapter 11 Reorganizations,* 24–JAN AM. BANKR. INST. J. 12 (2006); Ronald F. Greenspan and Cynthia Nelson, *"UnTill" We Meet Again, Why the Till Decision Might Not be the Last Word on Cramdown Interest Rates,* 23–JAN AM. BANKR. INST. J. 48 (2005). Very few published decisions have addressed this question so far.

In *In re American HomePatient, Inc.,* the Sixth Circuit declined "to blindly adopt *Till's* endorsement of the formula approach for Chapter 13 cases in the Chapter 11 context." 420 F.3d 559, 568 (6th Cir.2005). Instead, following the reference in footnote 14 of the Supreme Court's opinion, the Sixth Circuit determined "that the market rate should be applied in Chapter 11 cases where there exists an efficient market. But where no efficient market exists for a Chapter 11 debtor, then the bankruptcy court should employ the formula approach endorsed by the *Till* plurality." *Id.* Thus, in a Chapter 11 case, the court should look first to the relevant market, and if one does not exist, then turn to the formula approach.

Similarly, Judge Raslavich in *In re Prussia Associates* interpreted *Till* to mean that "other things being equal, the formula approach should be followed in Chapter 11 just as in Chapter 13." 322 B.R. 572, 589 (Bankr.E.D.Pa.2005). However, departure from the formula approach in the Chapter 11 context may be appropriate "where an efficient market exists which may obviate the need for resort to the formula approach, or perhaps lessen the virtues of that approach." *Id.* "The Supreme Court's dicta implies that the Bankruptcy Court in such circumstances (i.e., efficient markets) should exercise discretion in evaluating an appropriate cramdown interest rate by considering the availability of market financing." *Id.* Concluding that there was an insufficient evidentiary basis about the availability of market financing, Judge Raslavich defaulted to the formula approach. *See also In re Mirant Corp.,* No. 03–46590–DML–11, 2005 WL 3471546, *12 (Bankr.N.D.Tex. Dec.9, 2005) (finding *Till* relevant to the determination of value); *In re Deep River Warehouse, Inc.,* No. 04–52749, 2005 WL 2319201 (Bankr.M.D.N.C. Sept.22, 2005); *In re LWD, Inc.,* 332 B.R. 543, 556 (Bankr. W.D.Ky.2005).

The *American HomePatient* and *Prussia Associates* decisions confirm that the three considerations identified in *Till* are equally relevant in the Chapter 11 context. As *Till* noted, the present value provisions of Chapter 13 carry over to section 1129. Likewise, just as Chapter 13 debtors may modify secured claims under section 1322(b)(2), Chapter 11 debtors may modify creditors' rights under section 1123. Finally, the "objective economic analysis" required under Chapter 13 "to treat similarly situated creditors similarly," and to ensure that "the debtor's interest payments will adequately compensate all such creditors for the time value of their money and the risk of default," is equally applicable to Chapter 11 cases. 541 U.S. at 477, 124 S.Ct. at 1960.

Footnote 14 in *Till* suggests that "it might make sense [when picking a cram down rate in a Chapter 11 case] to ask what rate an efficient market would produce.," *Id.* at 477 n. 14, 124 S.Ct. at 1960 n. 14. The suggestion is not inconsistent with the Court's assumption that Congress intended that essentially the same approach to choosing an interest rate for present value be followed in Chapters 11, 12 and 13. Rather, the footnote provides "a further explanation of how the goals set forth by the Court can best be accomplished in the context of a chapter 11 case." Mikels and Walker, 24–JAN AM. BANKR. INST. J. 12.

■ Here, there has been no evidence produced to establish that an "efficient market" exists to refinance the mortgages on the debtors' property immediately, as the debtors are emerging from their Chapter 11 case.[1] We therefore begin with the national prime rate adjusted to account for the "greater risk of nonpayment" that bankruptcy debtors typically pose. *Id.* at 479, 124 S.Ct. at 1961. The risk adjustment should consider "such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.* Here, the confirmed plan requires the debtors to refinance within one year of the effective date. There is a sizeable equity cushion protecting UBIC's position. UBIC has the right to continue foreclosure proceedings up to the point of judgment. In addition, UBIC will be receiving adequate protection payments from the debtors. These factors reflect that the risk of nonpayment is negligible, warranting a nominal adjustment to the prime rate of 1%. I so conclude.

---

1. Because the applicable legal framework for choosing an appropriate interest rate was not addressed prior to confirmation, if UBIC de-

Debtors' counsel shall submit a form of order consistent with this opinion.

sires to reopen the record to produce evidence about applicable interest rates, I will reopen the record to consider such testimony.