# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 1, 2013

No. 11-11109

Lyle W. Cayce
Clerk

In the Matter of:  TEXAS GRAND PRAIRIE HOTEL REALTY, L.L.C.,

Debtor

------------------------------

WELLS FARGO BANK NATIONAL ASSOCIATION, as Trustee for the Morgan Stanley Capital I Incorporated, Commercial Mortgage Pass - Through Certificates Trust, Series 2007-XLF9, acting by and through its Special Servicer, Berkadia Commercial Mortgage, L.L.C.,

Appellant

v.

TEXAS GRAND PRAIRIE HOTEL REALTY, L.L.C.; TEXAS AUSTIN HOTEL REALTY, L.L.C.; TEXAS HOUSTON HOTEL REALTY, L.L.C.; TEXAS SAN ANTONIO HOTEL REALTY, L.L.C.,

Appellees

Appeal from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, ELROD, and HAYNES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

No. 11-11109

Wells Fargo Bank National Association ("Wells Fargo") appeals from a district court decision affirming confirmation of a Chapter 11 cramdown plan. Finding no error in the bankruptcy court's judgment,[1] we affirm.

## I.

In 2007, Texas Grand Prairie Hotel Realty, LLC, Texas Austin Hotel Realty, LLC, Texas Houston Hotel Realty, LLC, and Texas San Antonio Hotel Realty, LLC (collectively, "Debtors") obtained a $49,000,000 loan from Morgan Stanley Mortgage Capital, Inc., applying the proceeds to acquire and renovate four hotel properties in Texas. Morgan Stanley — not a party to this case — took a security interest in the hotel properties and in substantially all of the Debtors' other assets. Wells Fargo eventually acquired the loan from Morgan Stanley.

In 2009, the Debtors' hotel business soured. Unable to pay Wells Fargo's loan as payment came due, the Debtors filed for Chapter 11 protection and proposed a plan of reorganization. When Wells Fargo rejected the proposed reorganization, the Debtors sought to cram down their plan under 11 U.S.C. § 1129(b). The plan valued Wells Fargo's secured claim at roughly $39,080,000, in accordance with Wells Fargo's own appraisal. Under the plan, the Debtors proposed to pay off Wells Fargo's secured claim over a term of ten years, with interest accruing at 5% — 1.75% above the prime rate on the date of the confirmation hearing.[2]

---

[1] *See In re Berryman Prods., Inc.*, 159 F.3d 941, 943 (5th Cir. 1998) ("In the bankruptcy appellate process, we perform the same function as did the district court: Fact findings of the bankruptcy court are reviewed under a clearly erroneous standard and issues of law are reviewed *de novo*.").

[2] The Debtors later agreed to reduce the repayment term to seven years.

No. 11-11109

The bankruptcy court held a two-day evidentiary hearing to assess whether it could confirm the Debtors' plan under § 1129(b) over Wells Fargo's objection. Among other things, Wells Fargo challenged the Debtors' proposed 5% interest rate on its secured claim. Both parties stipulated that the applicable rate should be determined by applying the "prime-plus" formula endorsed by a plurality of the Supreme Court in *Till v. SCS Credit Corp.*[3] However, the parties' experts disagreed on the application of that formula: whereas the Debtors' expert — Mr. Louis Robichaux — testified that it supported a 5% rate, Wells Fargo's expert insisted that it mandated a rate of at least 8.8%.

Wells Fargo filed a *Daubert* motion seeking to strike Robichaux's testimony under Rule 702, insisting that "Robichaux's . . . failure to correctly apply *Till* and its progeny show[s] that his methodology is flawed, does not comport with applicable law, and is unreliable." The bankruptcy court denied Wells Fargo's motion to strike, adopted Robichaux's analysis as correct, and confirmed the Debtors' cramdown plan.

Wells Fargo appealed to the district court, challenging the bankruptcy court's decision to admit Robichaux's testimony as well as the court's adoption of Robichaux's § 1129(b) interest-rate analysis. The district court affirmed and this appeal followed. The Debtors have moved to dismiss the appeal as equitably moot.

## II.

We begin by reviewing *de novo* the Debtors' equitable mootness defense.[4] The doctrine of equitable mootness is unique to bankruptcy proceedings, responsive to the reality that "there is a point beyond which a court cannot order

---

[3] 541 U.S. 465 (2004).

[4] *See In re GWI PCS 1, Inc.*, 230 F.3d 788, 799–800 (5th Cir. 2000).

No. 11-11109

fundamental changes in reorganization actions."[5]   To establish equitable mootness, a debtor must show that (i) the plan of reorganization has not been stayed, (ii) the plan has been "substantially consummated," and (iii) the relief requested by the appellant would "affect either the rights of parties not before the court or the success of the plan."[6] Wells Fargo here stipulates that the first two elements are satisfied.

This Circuit has taken a narrow view of equitable mootness, particularly where pleaded against a secured creditor.[7] Reasoning that "the possibility of partial recovery obviates the need for equitable mootness,"[8] we have permitted appeals to go forward even where granting full relief "could have imposed a very significant liability on the estate, to the great detriment of both the success of the reorganization and third parties."[9] For example, in *Matter of Scopac*, we permitted secured creditors to appeal a bankruptcy court valuation order whose reversal had the potential to — and ultimately *did* — impose millions of dollars in liability on a cash-starved entity just emerging from bankruptcy.[10] In *Matter*

---

[5] *In re Scopac*, 624 F.3d 274, 281 (5th Cir. 2010) (*Scopac I*).

[6] *Id.*

[7] *See In re Pacific Lumber Co.*, 584 F.3d 229, 243 (5th Cir. 2009) ("Secured credit represents property rights that ultimately find a minimum level of protection in the takings and due process clauses of the Constitution. . . . Federal courts should proceed with caution before declining appellate review of the adjudication of these rights under a judge-created abstention doctrine.").

[8] *In re Scopac*, 649 F.3d 320, 322 (5th Cir. 2011) (*Scopac II*).

[9] *Scopac I*, 624 F.3d at 282.

[10] *See id.* at 286 (awarding judgment of $29,700,000 to appellants).  *But see Scopac II*, 649 F.3d at 322 (clarifying that bankruptcy court had discretion to award less than the full judgment if necessary to avoid "jeopardiz[ing] the reorganized debtor's financial health").

*of Pacific Lumber Co.*, we allowed a secured creditor to appeal under similar circumstances.[11]

The Debtors insist that granting relief to Wells Fargo could result in a cataclysmic unwinding of the reorganization plan. According to the Debtors, "all of the nearly $8 million in distributions made under the Plan, and all of the other actions taken in furtherance and implementation of the Plan — including transactions with third parties — will be in jeopardy of needing to be undone, clawed back, or otherwise abrogated." Moreover, the Debtors contend, any money judgment against them would come out of the pockets of unsecured creditors, as "[t]here is just one 'pot' of funds to distribute." Finally, the Debtors aver, a judgment in favor of Wells Fargo would affect the rights and expectations of the "Equity Purchaser" — that is, the Debtors themselves — who paid a substantial sum to acquire equity in the bankrupt entities pursuant to the reorganization plan.

While the Debtors' concerns might be realized, they need not be. This Court could grant partial relief to Wells Fargo without disturbing the reorganization, by, for example, awarding a slightly higher § 1129(b) cramdown interest rate or granting a small money judgment. The Debtors present no credible evidence that granting such fractional relief would require unwinding any of the transactions undertaken pursuant to the reorganization plan; indeed, by the Debtors' own account, they are *not* cash starved like the debtors in *Pacific Lumber* or *Scopac*, having enjoyed a substantial improvement in their revenues and cash position after filing for bankruptcy.

Nor do the Debtors present compelling evidence that granting fractional relief would unduly burden the rights of third parties not before the court.

---

[11] *See Pacific Lumber*, 584 F.3d at 243–50 (allowing secured creditors to appeal valuation order whose reversal could have imposed up to $90,000,000 on a cash-poor entity just emerging from bankruptcy).

No. 11-11109

Though the reorganization plan ties the unsecured creditors' recovery to the Debtors' projected net operating income through 2015, the Debtors' *actual* net operating income may be higher.  Moreover, in fiscal years 2016 and 2017 — after the Debtors' payment obligations to unsecured creditors have ended — the Debtors' own projections show a net operating income of approximately $3,200,000.  In other words, the possibility exists that the Debtors could afford a fractional payout without reducing distributions to third-party claimants.

As for the Debtors' assertion that a fractional award to Wells Fargo would affect their interest as equity holders in the reorganized bankrupt, perhaps they are correct.  But equitable mootness protects only "the rights of *parties not before the court*."[12]  The fact "that a judgment might have adverse consequences [to the equity holders of the reorganized bankrupt] is not only a natural result of any appeal . . . but [should have been] foreseeable to them as sophisticated investors."[13]

Unpersuaded by the Debtors' motion to dismiss this appeal as equitably moot, we proceed to the merits, turning first to Wells Fargo's claim that the bankruptcy court erred in admitting the testimony of the Debtors' restructuring expert — Mr. Louis Robichaux — regarding the appropriate § 1129(b) cramdown rate of interest.

### III.

According to Wells Fargo, Robichaux's testimony is inadmissible under Rule 702 because his "purely subjective approach to interest-rate setting" violates the Supreme Court's decision in *Till*, which "call[s] for an objective inquiry."

---

[12] *In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994) (emphasis added).

[13] *Pacific Lumber*, 584 F.3d at 244.

No. 11-11109

We review a trial court's decision to admit expert testimony for abuse of discretion.[14] As read by *Daubert*, Rule 702 requires trial courts to ensure that proffered expert testimony is "not only relevant, but reliable."[15] To determine reliability, the trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology can properly be applied to the facts in issue."[16] Two cautions signify: the trial court ought not "transform a *Daubert* hearing into a trial on the merits,"[17] and "most of the safeguards provided for in *Daubert* are not as essential in a case . . . where a district judge sits as the trier of fact in place of a jury."[18]

Here, Wells Fargo does not challenge Robichaux's factual findings, calculations, or financial projections, but rather argues that Robichaux's analysis as a whole rested on a flawed understanding of *Till*. As we read it, Wells Fargo's *Daubert* motion is indistinguishable from its argument on the merits. It follows that the bankruptcy judge reasonably deferred Wells Fargo's *Daubert* argument to the confirmation hearing instead of deciding it before the hearing.[19] We pursue the same path and proceed to the merits.

---

[14] *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 274 (5th Cir. 1998).

[15] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993).

[16] *Id.* at 590–91.

[17] *Pipitone v. Biomatrix Inc.*, 288 F.3d 239, 250 (5th Cir. 2002).

[18] *Gibbs v. Gibbs*, 210 F.3d 491, 500 (5th Cir. 2000).

[19] As the bankruptcy court observed, "[Wells Fargo's] objections to Mr. Robichaux's testimony really go to its disagreement to the merits of his opinion, and so that disagreement is really properly voiced as a response to the opinion itself."

No. 11-11109

## IV.

Wells Fargo claims that the bankruptcy court erred in setting a 5% cramdown rate. We turn first to the standard under which this Court reviews a Chapter 11 cramdown rate determination, then to its application.

### A.

Under 11 U.S.C. §1129(b), a debtor can "cram down" a reorganization plan over the dissent of a secured creditor only if the plan provides the creditor — in this case Wells Fargo — with deferred payments of a "value" at least equal to the "allowed amount" of the secured claim as of the effective date of the plan.[20] In other words, the deferred payments, discounted to present value by applying an appropriate interest rate (the "cramdown rate"), must equal the allowed amount of the secured creditor's claim.[21]

Wells Fargo contends that though a bankruptcy court's factual findings under § 1129(b) are reviewed only for clear error, a bankruptcy court's choice of *methodology* for calculating the § 1129(b) cramdown rate is a question of law subject to *de novo* review. Wells Fargo suggests that the Supreme Court's decision in *Till* supports its position, reasoning that *Till* is "controlling authority" that requires bankruptcy courts to apply the prime-plus formula to calculate the Chapter 11 cramdown rate.

We disagree. In *T-H New Orleans*, we "[declined] to establish a particular formula for determining an appropriate cramdown interest rate" under

---

[20] *See* 11 U.S.C. § 1129(b)(1)(A)(i)(II) ("[E]ach holder of a [secured claim must] receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property.").

[21] *E.g.*, *In re T-H New Orleans Ltd. P'ship*, 116 F.3d 790, 800 (5th Cir. 1997) ("[The Chapter 11 cramdown provision] has been interpreted to require that the total deferred payments have a present value equal to the amount of the secured claim.").

No. 11-11109

Chapter 11, reviewing the bankruptcy court's entire § 1129(b) analysis for clear error.[22] We reasoned that it would be imprudent to "tie the hands of the lower courts as they make the factual determination involved in establishing an appropriate interest rate."[23] Though Wells Fargo contends that we overruled *T-H New Orleans* in our subsequent decision in *Matter of Smithwick*,[24] this reading of *Smithwick* is untenable. In *Smithwick*, we held that bankruptcy courts must calculate the Chapter 13 cramdown rate using the "presumptive contract rate" approach.[25] However, we reaffirmed that "[t]his court has declined to establish a particular formula for the cramdown interest rate in Chapter 11 cases."[26] We justified our departure from *T-H New Orleans* in the Chapter 13 context on the ground that the need for judicial guidance is more acute in the case of individual bankruptcies, given the "greater need to reduce litigation expenses associated with an individualized discount rate determination."[27] *Smithwick* is not in tension with *T-H New Orleans*'s application in Chapter 11 proceedings.

Nor is *Till*. In *Till*, a plurality of the Supreme Court ruled that bankruptcy courts must calculate the Chapter 13 cramdown rate by applying the

---

[22] *See T-H New Orleans*, 116 F.3d at 800; *see also In re Briscoe Enters., Ltd., II*, 994 F.2d 1160, 1169 (5th Cir. 1993) ("We review a bankruptcy court's calculation of an appropriate interest rate for clear error. Courts have used a wide variety of different rates as benchmarks in computing the appropriate interest rate (or discount rate as it is frequently termed) for the specific risk level in their cases.").

[23] *T-H New Orleans*, 116 F.3d at 800.

[24] 121 F.3d 211 (5th Cir. 1997).

[25] *Id.* at 214–15.

[26] *Id.*

[27] *Id.*

No. 11-11109

prime-plus formula.[28] While the plurality suggested that this approach should also govern under Chapter 11,[29] we have held that "[a] Supreme Court decision must be more than merely illuminating with respect to the case before us, because a panel of this court can only overrule a prior panel decision if such overruling is unequivocally directed by controlling Supreme Court precedent."[30] As we recognized in *Drive Financial Services, L.P. v. Jordan,*[31] *Till* was a splintered decision whose precedential value is limited even in the Chapter 13 context.[32] While many courts have chosen to apply the *Till* plurality's formula method under Chapter 11, they have done so because they were *persuaded* by the plurality's reasoning, not because they considered *Till* binding.[33] Ultimately, the plurality's suggestion that its analysis also governs in the Chapter 11 context — which would be dictum even in a majority opinion — is not "controlling . . . precedent."[34]

---

[28] 541 U.S. 465, 479–81 (2004).

[29] *See id.* at 474–75.

[30] *Reed v. Fla. Metro. Univ., Inc.*, 681 F.3d 630, 648 (quoting *Martin v. Medtronic, Inc.*, 254 F.3d 573, 577 (5th Cir. 2001) (quoting *United States v. Zuniga–Salinas*, 945 F.2d 1302, 1306 (5th Cir. 1991))).

[31] 521 F.3d 343 (5th Cir. 2008).

[32] *Id.* at 350 ("[W]e hold that the *Till* plurality's adoption of the prime-plus interest rate approach is binding precedent in cases presenting an essentially indistinguishable factual scenario."); *see also Good v. RMR Invs., Inc*, 428 B.R. 249, 255 (E.D. Tex. 2010) ("In *Drive* [*Financial*], the Fifth Circuit only narrowly adopted the formula approach for Chapter 13 cases. . . . Therefore, in the Fifth Circuit, bankruptcy courts still enjoy some latitude in determining which method should be applied to determine the cramdown interest rate in Chapter 11 cases.").

[33] *See, e.g.*, *In re Am. HomePatient, Inc.*, 420 F.3d 559, 567 (6th Cir. 2005) (adopting *Till* plurality approach as persuasive); *In re Prussia Assocs.*, 322 B.R. 572, 585, 589 (Bankr. E.D. Pa. 2005) (same); *In re Cantwell*, 336 B.R. 688, 692 (Bankr. D.N.J. 2006) (same).

[34] *Reed*, 681 F.3d at 648 (quoting *Martin*, 254 F.3d at 577 (quoting *Zuniga–Salinas*, 945 F.2d at 1306)).

No. 11-11109

Today, we reaffirm our decision in *T-H New Orleans*. We will not tie bankruptcy courts to a specific methodology as they assess the appropriate Chapter 11 cramdown rate of interest; rather, we continue to review a bankruptcy court's entire cramdown-rate analysis only for clear error.

## B.

At length, we turn to address whether the bankruptcy court clearly erred in assessing a 5% cramdown rate under § 1129(b). While both parties stipulate that the *Till* plurality's formula approach governs the applicable cramdown rate, they disagree on what that approach requires.

## 1.

Under the *Till* plurality's formula method, a bankruptcy court should begin its cramdown rate analysis with the national prime rate — the rate charged by banks to creditworthy commercial borrowers — and then add a supplemental "risk adjustment" to account for "such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan."[35] Though the plurality "d[id] not decide the proper scale for the risk adjustment," it observed that "other courts have generally approved adjustments of 1% to 3%."[36]

In ruling that the formula method governs under Chapter 13, the *Till* plurality was motivated primarily by what it viewed as the method's simplicity and objectivity.[37] First, the plurality reasoned, the method minimizes the need for costly evidentiary hearings, as the prime rate is reported daily, and as "many

---

[35] 541 U.S. 465, 479 (2004).

[36] *Id.* at 480.

[37] *Id.* at 474–76.

of the factors relevant to the [risk] adjustment fall squarely within the bankruptcy court's area of expertise."[38]   Second, the plurality observed, the approach varies only in "the state of financial markets, the circumstances of the bankruptcy estate, and the characteristics of the loan" instead of inquiring into a particular creditor's cost of funds or prior contractual relations with the debtor.[39]

For these same reasons, the plurality "reject[ed] the coerced loan, presumptive contract rate, and cost of funds approaches," as "[e]ach of these approaches is complicated, imposes significant evidentiary costs, and aims to make each individual creditor whole rather than to ensure the debtor's payments have the required present value."[40] The plurality was particularly critical of the coerced loan approach applied by the Seventh Circuit below, noting that it "requires bankruptcy courts to consider evidence about the market for comparable loans to similar (though nonbankrupt) debtors — an inquiry far removed from such courts' usual task of evaluating debtors' financial circumstances and the feasibility of their debt adjustment plans."[41]

Having explained its prime-plus formula, the plurality applied it to the case before the Court, in which the secured creditor — an auto-financing company — objected to the bankruptcy court's assessment of a cramdown rate at 1.5% over prime.[42] The creditor claimed that this cramdown rate was woefully inadequate to compensate it for the risk that the debtor would default on its restructured obligations, presenting evidence that the subprime financing

---

[38] *Id.* at 479.

[39] *Id.* at 479–80.

[40] *Id.* at 477.

[41] *Id.*

[42] *Id.* at 471–72.

market would demand a rate of at least prime plus 13% for a comparable loan.[43] The plurality rejected the creditor's arguments and affirmed the bankruptcy court's 1.5% risk adjustment, observing that the debtor's expert had testified that the rate was "very reasonable given that Chapter 13 plans are supposed to be feasible."[44]

In a spirited dissent, Justice Scalia warned that the plurality's approach would "systematically undercompensate" creditors.[45]   Justice Scalia observed that "based on even a rudimentary financial analysis of the facts of this case, the 1.5% [risk adjustment assessed by the plurality] is obviously wrong — not just off by a couple percent, but probably by roughly an order of magnitude."[46] As for the plurality's reference to the testimony of the debtors' economics expert, Justice Scalia noted that "[n]othing in the record shows how [the expert's] platitudes were somehow manipulated to arrive at a figure of 1.5 percent."[47] Justice Scalia concluded that it was "impossible to view the 1.5% figure as anything other than a smallish number picked out of a hat."[48]

While *Till* was an appeal from a Chapter 13 proceeding, the plurality observed that "Congress [likely] intended bankruptcy judges and trustees to follow essentially the same [formula] approach when choosing an appropriate interest rate under [Chapters 11]," reasoning that the applicable statutory language was functionally identical in both contexts.[49] However, in Footnote 14,

---

[43] *Id.*

[44] *Id.*

[45] *Id.* at 492 (Scalia, J., dissenting).

[46] *Id.* at 501.

[47] *Id.* at 500.

[48] *Id.* at 501.

[49] *Id.* at 474–75 (plurality opinion).

the plurality appeared to qualify its extension of the prime-plus formula to Chapter 11, observing that as "efficient markets" for exit financing often exist in business bankruptcies, a "market rate" approach might be more suitable for making the cramdown rate determination under § 1129(b).[50]

In spite of Justice Scalia's warning, the vast majority of bankruptcy courts have taken the *Till* plurality's invitation to apply the prime-plus formula under Chapter 11.[51] While courts often acknowledge that *Till*'s Footnote 14 appears to endorse a "market rate" approach under Chapter 11 *if* an "efficient market" for a loan substantially identical to the cramdown loan exists, courts almost invariably conclude that such markets are absent.[52] Among the courts that follow *Till*'s formula method in the Chapter 11 context, "risk adjustment" calculations have generally hewed to the plurality's suggested range of 1% to 3%.[53] Within that range, courts typically select a rate on the basis of a holistic

---

[50] *See id.* at 477 n.14.

[51] Gary W. Marsh & Matthew M. Weiss, *Chapter 11 Interest Rates After* Till, 84 AM. BANKR. L. J. 209, 221 (2010) ("*Till*'s formula approach, which adds the prime rate to a debtor-specific risk adjustment, should now be considered the default interest rate for a Chapter 11 cramdown."); *see In re Mirant Corp.*, 334 B.R. 800, 821 (Bankr. N.D. Tex. 2005) (concluding that *Till* is "clearly relevant" in the Chapter 11 context, and that "*Till* makes clear that the market in fact does not properly measure the [cramdown rate]."); *see also In re Pamplico Highway Dev., LLC*, 468 B.R. 783, 795 (Bankr. D.S.C. 2012) (collecting cases); *In re SW Boston Hotel Venture*, 460 B.R. 38, 55 (Bankr. D. Mass. 2011) (collecting cases).

[52] *See, e.g.*, *In re Nw. Timberline Enters.*, 348 B.R. 412, 432, 435 (Bankr. N. D. Tex. 2006) (applying prime-plus formula after concluding that the evidence was insufficient to establish the existence of an efficient market); *Pamplico,* 468 B.R. at 793 (same); *In re Walkabout Creek Ltd. Divident Hous. Ass'n Ltd*, 460 B.R. 567, 574 (Bankr. D.D.C. 2011) (same); *In re 20 Bayard Views, LLC*, 445 B.R. 83 (Bankr. E.D.N.Y. 2011) (same); *SW Boston Hotel*, 460 B.R. at 55 (same); *In re Hockenberry*, 457 B.R. 646, 657 (Bankr. S.D. Ohio 2011) (same); *In re Riverbend Leasing LLC*, 458 B.R. 520, 536 (Bankr. S.D. Iowa 2011) (same); *In re Bryant*, 439 B.R. 724, 742–43 (Bankr. E.D. Ark. 2010) (same).

[53] *E.g.*, *In re Prussia Assocs.*, 322 B.R. 572, 591 (Bankr. E.D. Pa. 2005) ("The risk premium, per *Till*, will normally fluctuate between 1% and 3%."); *Riverbend Leasing*, 458 B.R. at 535 ("[T]he general consensus that has emerged provides that a one to three percent adjustment to the prime rate as of the effective date is appropriate."); *see also Pamplico,* 468

No. 11-11109

assessment of the risk of the debtor's default on its restructured obligations,[54] evaluating factors including the quality of the debtor's management, the commitment of the debtor's owners, the health and future prospects of the debtor's business, the quality of the lender's collateral, and the feasibility and duration of the plan.[55]

**2.**

Returning to the proceedings in this case, both Wells Fargo and the Debtors presented the bankruptcy court with expert testimony on the appropriate prime-plus cramdown rate. Mr. Louis Robichaux, the Debtors' expert, began his analysis by quoting the prime rate at 3.25%. He then proceeded to assess a risk adjustment by evaluating the factors enumerated by the *Till* plurality, looking to "the circumstances of the [D]ebtors' estate, the nature of the security, and the duration and feasibility of the plan." Robichaux concluded that the Debtors' hotel properties were well maintained and excellently managed, that the Debtors' owners were committed to the business, that the Debtors' revenues exceeded their projections in the months prior to the hearing, that Wells Fargo's collateral was stable or appreciating, and that the Debtors' proposed cramdown plan would be tight but feasible. On the basis of

B.R. at 795 (collecting cases).

[54] Marsh & Weiss, *supra* note 51, at 221; *see also Pamplico,* 468 B.R. at 794 ("[T]he general consensus among courts is that a one to three percent adjustment to the prime rate is appropriate, with a 1.00% adjustment representing the low risk debtor and a 3.00% adjustment representing a high risk debtor"); *In re Lilo Props., LLC*, 2011 WL 5509401 at *2 (Bankr. D. Vt. 2011) ("The Court starts with the premise that the lowest-risk debtors would pay prime plus 1% and the highest-risk debtors would pay prime plus 3%.").

[55] *See, e.g., SW Boston Hotel,* 460 B.R. at 57 (examining quality of management); *Prussia Assocs.*, 322 B.R. at 593 (examining commitment of owner); *Riverbend Leasing*, 458 B.R. at 536 (examining health and future prospects of business); *Walkabout Creek*, 460 B.R. at 574 (examining quality of collateral); *Bryant*, 439 B.R. at 743 (examining repayment term).

these findings, Robichaux assessed the risk of default "just to the left of the middle of the risk scale." As *Till* had suggested that risk adjustments generally fall between 1% and 3%, Robichaux reasoned that a 1.75% risk adjustment would be appropriate.

Wells Fargo's expert, Mr. Richard Ferrell, corroborated virtually all of Robichaux's findings with respect to Debtors' properties, management, ownership, and projected earnings. Ferrell also agreed that the applicable prime rate was 3.25%. However, Ferrell devoted the vast majority of his cramdown rate analysis to determining the rate of interest that the market would charge to finance an amount of principal equal to the cramdown loan. Because Ferrell concluded that there was no market for single, secured loans comparable to the forced loan contemplated under the cramdown plan, he calculated the market rate by taking the weighted average of the interest rates the market would charge for a multi-tiered exit financing package comprised of senior debt, mezzanine debt, and equity. Ferrell's calculations yielded a "blended" market rate of 9.3%.[56]

To bring his "market influenced" analysis within the form of *Till*'s prime-plus method, Ferrell purported to "utilize the [3.25%] Prime Rate as the Base Rate," making an upward "adjustment" of 6.05% to account for "the nature of the security interest." This calculation yielded Ferrell's 9.3% blended market rate.[57]

---

[56] More precisely, Mr. Ferrell determined that the market could finance the first $23,448,000 of the cramdown loan at a rate of 6.25%, in exchange for a first mortgage on the Debtors' hotel properties. He then determined that the balance of the cramdown loan could be financed through a combination of mezzanine debt, at a rate of 11%, and equity, at a constructive rate of 22%. The weighted average of the interest rates on these three financing tranches was 9.3%.

[57] As Wells Fargo's briefs on appeal implicitly concede, Mr. Ferrell thus effectively chose the *market* rate, and not the prime rate, as the starting point of his cramdown rate analysis. *Cf.* C.B. Reehl & Stephen P. Milner, *Chapter 11 Real Estate Cram-Down Plans: The Legacy of* Till, 30 CAL. BANKR. J. 405, 410 ("[I]f the risk adjustment could take on any value, *Till* would have no relevance since cram-down interest rates could be determined reverse

No. 11-11109

Mr. Ferrell then adjusted the blended rate in accordance with the remaining *Till* factors, making a downward adjustment of 1.5% to account for the sterling "circumstances of the bankruptcy estate" and an upward adjustment of 1% to account for the plan's tight feasibility. Ultimately, Mr. Ferrell concluded that Wells Fargo was entitled to a cramdown rate of 8.8%.

The bankruptcy court agreed with the parties that *Till* was "instructive, if not controlling" under Chapter 11. Turning to Mr. Robichaux's analysis, the court concluded that "Mr. Robichaux properly interpreted *Till* and properly applied it," and that his "assessment of the circumstances of the estate, the nature of the security, and the feasibility of the plan . . . [were] credible and persuasive." As for Mr. Ferrell's analysis, the court rejected it as inconsistent with *Till*'s prime-plus method:

> I disagree with [Mr. Ferrell's] approach because it establishes a benchmark before adjustment that I just view to be completely inconsistent with *Till*. *Till* set that benchmark at national prime, but according to Mr. Ferrell, you first determine what level any portion of a loan would be financeable, and then you begin to work from there. . . . The Court finds no support for that type of analysis in *Till*. If anything this strikes the Court as more in the nature of a forced loan approach that the majority in *Till* expressly rejected.

Ultimately, the court determined, "[Robichaux's] risk adjustment rate of 1.75% is defensible, . . . especially . . . in light of the modifications to the plan which render, in the Court's opinion, the plan feasible." Consequently, the court concluded that Wells Fargo was entitled to a 5% cramdown rate.

---

engineered through application of other methodologies . . . . In other words, the same market factors used to develop cram-down interest rates before *Till*, could now be used to determine the value of the risk adjustment.").

17

**3.**

We agree with the bankruptcy court that Robichaux's § 1129(b) cramdown rate determination rests on an uncontroversial application of the *Till* plurality's formula method. As the plurality instructed, Robichaux engaged in a holistic evaluation of the Debtors, concluding that the quality of the bankruptcy estate was sterling, that the Debtors' revenues were exceeding projections, that Wells Fargo's collateral — primarily real estate — was liquid and stable or appreciating in value, and that the reorganization plan would be tight but feasible. On the basis of these findings — which were all independently verified by Ferrell — Robichaux assessed a risk adjustment of 1.75% over prime. This risk adjustment falls squarely within the range of adjustments other bankruptcy courts have assessed in similar circumstances.[58]

We also agree that Ferrell predicated his 8.8% cramdown rate on the sort of comparable loans analysis rejected by the *Till* plurality. Wells Fargo's briefs repeatedly aver that the plurality characterized "the market for comparable loans" as "relevant," complaining that Ferrell's analysis can "hardly be consigned to the dustbin for considering relevant information." However, aside from the fact that Wells Fargo takes the quoted language out of context, the plurality expressly rejected methodologies that "require[] the bankruptcy courts to consider evidence about the market for comparable loans," noting that such approaches "require an inquiry far removed from such courts' usual task of

---

[58] *See SW Boston Hotel,* 460 B.R. at 57 (assessing risk adjustment of 1.0% over prime for a Chapter 11 cramdown loan secured by hotel properties); *In re Indus. W. Commerce Ctr., LLC*, 2011 WL 330018 (9th Cir. BAP 2011) (assessing risk adjustment of 1.70% over prime for Chapter 11 cramdown loan secured by commercial real property); *Prussia Assocs.*, 322 B.R. at 591 (assessing risk adjustment of 1.5% above prime where "the risks attendant to the proposed loan [were] neither negligible nor extreme"); *see also Pamplico*, 468 B.R. at 795 (collecting cases).

No. 11-11109

evaluating debtors' financial circumstances and the feasibility of their debt-adjustment plans."[59]

Wells Fargo complains that Robichaux's analysis produces "absurd results," pointing to the undisputed fact that on the date of plan confirmation, the market was charging rates in excess of 5% on smaller, over-collateralized loans to comparable hotel owners. While Wells Fargo is undoubtedly correct that no willing lender would have extended credit on the terms it was forced to accept under the § 1129(b) cramdown plan, this "absurd result" is the natural consequence of the prime-plus method, which sacrifices market realities in favor of simple and feasible bankruptcy reorganizations.[60] Stated differently, while it may be "impossible to view" Robichaux's 1.75% risk adjustment as "anything other than a smallish number picked out of a hat,"[61] the *Till* plurality's formula approach — not Justice Scalia's dissent — has become the default rule in Chapter 11 bankruptcies.

Notably, Wells Fargo makes no attempt to predicate Ferrell's "market-influenced" blended rate calculation on the *Till* plurality's Footnote 14, which suggests that a "market rate" approach should apply in Chapter 11 cases where

---

[59] *Till*, 541 U.S. at 477. Wells Fargo also urges that *Till* characterized the formula approach as an "objective inquiry," apparently viewing this language as a ringing endorsement of the type of quantitative market analysis performed by Ferrell. In fact, the plurality was merely suggesting that its prime-plus approach incorporated an objective baseline — the prime rate — and did not depend on a complicated market analysis of any specific creditor's cost of funds. *See id.* at 466–67.

[60] *See Till*, 541 U.S. at 479 ("[U]nlike the coerced loan, presumptive contract rate, and cost of funds approaches, the formula approach entails a straightforward, familiar, and objective inquiry, and minimizes the need for potentially costly additional evidentiary proceedings); *id.* at 504 (Scalia, J. dissenting) ("[T]he 1.5% premium adopted in this case is far below anything approaching fair compensation. That result . . . is the entirely predictable consequence of a methodology that tells bankruptcy judges to set interest rates based on highly imponderable factors.").

[61] *Id.* at 501 (Scalia, J., dissenting).

19

"efficient markets" for exit financing exist.[62]  Footnote 14 has been criticized by commentators, who observe that it rests on the untenable assumption that the voluntary market for forced cramdown loans is somehow less illusory in the Chapter 11 context than it is in the Chapter 13 context.[63]  Nevertheless, many courts — including the Sixth Circuit — have found Footnote 14 persuasive, concluding that a "market rate" approach should be used to calculate the Chapter 11 cramdown rate in circumstances where "efficient markets" for exit financing exist.[64]

Even assuming, however, that Footnote 14 has some persuasive value, it does not suggest that the bankruptcy court here committed any error.  Among the courts that adhere to Footnote 14, most have held that markets for exit financing are "efficient" only if they offer a loan with a term, size, and collateral comparable to the forced loan contemplated under the cramdown plan.[65]  In the present case, Ferrell himself acknowledged that "there's no one in this market today that would loan this loan to the debtors — one to one loan-to-value ratio,

---

[62] *Till*, 541 U.S. at 477 n.14.  Footnote 14 demonstrates that the *Till* plurality itself drew a clear distinction between its "prime-plus" approach on the one hand, and a "market rate" approach on the other.

[63] COLLIER ON BANKRUPTCY ¶ 1129.05[2][c][i] (16th ed. rev. 2012) ("The problem with [Footnote 14] is that the relevant market for  involuntary loans in chapter 11 may be just as illusory as in chapter 13."); Thomas J. Yerbich, *How Do You Count the Votes — or did* Till *tilt the Game?*, AM. BANKR. INST. J., July/Aug. 2004, at 10 ("There is no more of a 'free market of willing cramdown lenders' in a chapter 11 . . . than in a chapter 13.").

[64] *See In re Am. HomePatient, Inc.*, 420 F.3d 559, 568 (6th Cir. 2005) ("[W]e opt to take our cue from Footnote 14 of the [plurality] opinion, which offered the guiding principle that "when picking a cram down rate in a Chapter 11 case, it might make sense to ask what rate an efficient market would produce."); *see also* Marsh & Weiss, *supra* note 51, at 213 ("Since *American HomePatient* . . . [a] majority of courts hold that, where an efficient market exists, the market rate should be applied, but where no efficient market can be established, the court should apply the prime-plus formula adopted in *Till*.").

[65] *E.g., In re 20 Bayard Views, LLC* 445 B.R. 83, 110–11 (Bankr. E.D.N.Y. 2011); *In re SW Boston Hotel Venture*, 460 B.R. 38, 55 (Bankr. D. Mass. 2011).

No. 11-11109

39 million dollars, secured by these properties." While Ferrell concluded that exit financing could be cobbled together through a combination of senior debt, mezzanine debt, and equity financing, courts including the Sixth Circuit have rejected the argument that the existence of such tiered financing establishes "efficient markets," observing that it bears no resemblance to the single, secured loan contemplated under a cramdown plan.[66]

\* \* \*

The bankruptcy court in this case calculated the disputed 5% cramdown rate on the basis of a straightforward application of the prime-plus approach — an approach that has been endorsed by a plurality of the Supreme Court, adopted by the vast majority of bankruptcy courts, and, perhaps most importantly, accepted as governing by both parties to this appeal. On this record, we cannot conclude that the bankruptcy court's cramdown rate calculation is clearly erroneous. However, we do not suggest that the prime-plus formula is the only — or even the optimal — method for calculating the Chapter 11 cramdown rate.

## V.

The judgment of the district court is AFFIRMED.

---

[66] *Am. HomePatient*, 420 F.3d at 568–69; *20 Bayard Views*, 445 B.R. at 110–11; *SW Boston Hotel*, 460 B.R. at 55–58; *see also* Marsh & Weiss, *supra* note 51, at 221 ("[C]ourts have generally been unreceptive to the use of tiered financing as a basis for establishing a market interest rate.").